UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERESA ELY,

                       Plaintiff,                            Case Number 14-14500

v.                                                  Honorable David M. Lawson

DEARBORN HEIGHTS SCHOOL
DISTRICT NO. 7, TODD THIEKEN,
and JEFFREY L. BARTOLD,

                       Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Theresa Ely filed suit against her employer and her supervisors after they disciplined her for speaking out about possible asbestos contamination at a school where she worked as a part-time custodian. She alleges that the defendants unlawfully restrained her right to speak and retaliated against her in violation of the First Amendment. Both sides filed motions for summary judgment. The defendants contend that the plaintiff has failed to advance any viable claim that can be supported by the record now before the Court, and the individual defendants argue that they are entitled to qualified immunity. The plaintiff contends that no fact question remains for trial on her claims and the Court should grant judgment as a matter of law in her favor and award compensatory and exemplary damages. The plaintiff has failed to establish a claim against the Dearborn Heights School District Number 7 under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), but fact questions preclude summary judgment in favor of the individual defendants and the plaintiff. Therefore, the Court will grant in part and deny in part the defendants' motion for summary

judgment, deny the plaintiff's motion for summary judgment, and dismiss the case against the School District only.

I.

Ely began working for defendant Dearborn Heights School District Number 7 as a substitute custodian in 2009. During the summer months of 2011 and 2012, she worked as a custodian at Annapolis High School. During the 2012 summer months, the plaintiff's supervisor directed her to sand floor tiles in the school building, but the plaintiff objected because she was told during the previous summer that the tiles contained asbestos. The supervisor told Ely that "sanding the tiles would be fine," and when she and other workers continued to object, she was told to collect a sample of the dust from the floor tiles for testing. In September 2012, a coworker told Ely that the testing of the dust sample revealed no asbestos. However, in January 2013, Ely learned that another employee who worked at Annapolis High School had died of mesothelioma, and members of the deceased employee's family told Ely that the school district "had sanded the asbestos floor tiles for years." Ely became concerned, particularly when she recalled that during the summer months there were numerous employees and students of the school district present in the building while the floor tile sanding was done. Ely testified that she even remembered that she saw students on one occasion writing messages in the sanding dust that was collected on the floor, while Ely and a coworker were busy sanding and cleaning up the dust.

In March 2013, Ely received a copy of what appeared to be a report of testing done on dust samples taken from the Annapolis school. She questioned the authenticity of that report because (1) it referred to difficulty encountered in collecting samples due to "fire damage," when there was never any fire at the school during the summer months in 2012; (2) the report referred in several

-2-

places to conditions at "the home," when the school obviously is not a residence; and (3) the report stated that samples were collected by the inspector, when the samples from the Annapolis school actually were collected by one of Ely's co-workers.  Ely also points out that the report is undated and unsigned, and she maintains that the inspector whose name appears on the report stated that he did not write it.  She contends that electronic metadata embedded in the Adobe Portable Document Format (PDF) version of the report indicates that it was created on September 14, 2012 by "Kellsey Whittaker," who the plaintiff asserts was a contractor working for the school district.

In April 2013, after reviewing the questionable testing report, Ely contacted the Michigan Occupational Safety and Health Administration ("MIOSHA") and filed a complaint stating her concerns about the possible asbestos hazard at the Annapolis school.  She also discussed her concerns with family members, co-workers, and other members of the community, and she contacted a local television news station, which sent a reporter to her home to interview her.  On May 15, 2013, the MIOSHA investigator assigned to the complaint told Ely that samples from the floor tiles she had sanded in 2012 were tested and found to contain asbestos, and the investigator told her that the agency was going to issue citations to the school district for the resulting safety and health violations.  He also told Ely that she should be tested to determine if she had suffered any possible health consequences from the asbestos exposure.  The next day, the district's Superintendent of Schools, defendant Jeffrey Bartold, sent a memorandum to all employees stating that there were no asbestos hazards at any of the district's schools; that letter cited the negative test results from the 2012 testing report.

On May 23, 2013, Bartold sent a letter of reprimand to Ely directing her to stop spreading "false rumors" about asbestos hazards at the district's schools.  The letter stated:

It has come to our attention that you have made comments to other Dearborn Heights School District #7 employees regarding the presence of asbestos in District buildings and the harmful medical effects that may result from exposure. Employees have come forward indicating that you have called them and told them to get "tested" for exposure to asbestos. As I have indicated to you and all other employees, two private companies and the Michigan Occupational Safety and Health Administration ("MIOSHA") have concluded that the District's asbestos levels are within state and federal regulations. Further, the investigator denied ever stating that any employee should get "tested" due to contact with asbestos.

. . .

The District interprets your statements to other employees regarding the presence of asbestos dust in any District building or any continued harm to employees or other individuals caused by contact with asbestos to be false and made with the intent of inflaming and provoking a reaction and concern from those employees and individuals.

. . .

This letter serves as a written reprimand for violating [the District Policies] stated above. Further, you are directed to cease notifying employees and other individuals that the District maintains levels of asbestos that are not within state or federal regulations. You are also directed to cease all communication to employees or other individuals that they should get "tested" due to the effects of asbestos contamination.

Plf.'s Mot for Summ J. [dkt. #20], Ex. 6, Letter of Reprimand dated May 23, 2013 (Pg ID 371-72).

The letter indicates that a copy was placed in the plaintiff's personnel file.

On June 5, 2013, inspector Michael T. Mason, a Health Manager with MIOSHA, sent a letter to Ely stating that the agency had inspected Annapolis High School and that the "investigation revealed conditions which were determined to be in violation of the Michigan Occupational Health Standards." The agency's investigation report that was enclosed with the letter stated that an inspection was conducted on April 30, 2013 at Annapolis High School, and that "[t]his investigation has resulted in a citation." The report cited the following specific violations that were assessed as a result of the inspection:

Discussions, observations and review of documentation indicated that during sanding of asbestos-containing floors, employees were exposed to asbestos-containing floor materials. Some damaged asbestos-containing flooring materials were observed.

-4-

> Appropriate personnel protective equipment was not provided.  Therefore, violations were determined.
>
> . . .
>
> Observations in the areas where the sanding of asbestos-containing flooring material occurred did not reveal any suspect asbestos-containing debris at this time.  In addition, these incidents occurred several months ago, and we did not observe how contaminated clothing was disposed of.    However, since sanding of asbestos-containing flooring materials is prohibited because of the potential significant exposure, violations were determined.

Ex. 8, Report of Investigation dated June 5, 2013, at 2 (Pg ID 389).  The report specifically noted that investigators had observed "9x9 vinyl floor tile material," described as "5% Chrysotile-Tile" (Chrysotile appears to be a form of asbestos).  The agency assessed three citations against the school district which were noted as "serious," and it imposed a total of $13,500 in fines.  The agency also directed the school district immediately to address the violations by (1) performing "initial monitoring" of employees who may have been exposed to asbestos; (2) at least once per year giving asbestos related safety training to custodial employees working in areas with asbestos-containing floor materials; and (3) adopting specific procedures during floor maintenance to ensure that machines used to clean and polish floors would not damage the asbestos-containing floor tile.  The specific directions given for floor maintenance were as follows:

> Prohibit sanding of asbestos-containing flooring materials.  Conduct stripping of finishes using wet methods and low abrasive pads at speeds lower than 300 revolutions per minute.    Perform burnishing or dry buffing only on asbestos-containing flooring that has sufficient finish so that the pad cannot contact the asbestos-containing material.

*Id.* at 12 (Pg ID 399).  Laboratory tests of floor tile samples that were taken from the school indicated that several of the specimens contained between 3% and 10% asbestos.  Further tests indicated that dust collected from a pad attached to a floor buffer at the school also contained detectable amounts of asbestos.

After the MIOSHA report and citations were issued, Ely continued to warn co-workers and members of the public about asbestos exposure and health consequences. Ely contends that, as a result of her continued warnings about the asbestos hazards in the District's schools, she was reprimanded a second time and again ordered to stop spreading "false rumors" by defendant Todd Thieken, another superintendent of the school district.

On September 3, 2014, Thieken sent a second letter of reprimand to the plaintiff referencing "misconduct, false statements, absenteeism, creating an unfriendly work environment and insubordination." Thieken's letter stated that he had investigated a number of complaints about the plaintiff's work and had determined that several violations of district policies and work rules had occurred. In particular, the letter noted: (1) excessive absenteeism (36 out of 142 possible work days from November 6, 2013 through July 10, 2014); (2) incidents when the plaintiff left work without contacting her supervisor to let him know she was leaving; and (3) incidents when the plaintiff provided notes from her doctor excusing her absence from work due to medical appointments, where the doctor's office indicated the plaintiff did not see the doctor on the days in question. The letter reiterated almost verbatim the passages from the earlier letter of reprimand regarding "false rumors" of asbestos hazards in the District's schools. Thieken wrote:

> You are again directed to cease notifying employees and other individuals that the District maintains levels of asbestos that are not within state or federal regulations. You are also directed to cease spreading false rumors regarding the health and safety of employees who work for the District.

Ex. 11, Letter of Reprimand dated Sept. 3, 2014, at 2-3 (Pg ID 425-26). Finally, the letter also noted that discussions with co-workers had revealed that "it [was] clear that it is very hard for others to work with" the plaintiff, and that her "attitude and dealings with other employees [were] unfriendly,

-6-

unprofessional and [did] not represent any kind of willingness to get along with other staff members." *Id.* at 3 (Pg ID 426). Thieken concluded his letter by warning Ely that:

> Your pattern of inappropriate behavior and absenteeism is inexcusable and cannot be tolerated by the District. . . . Further, such conduct, absenteeism, continued unwillingness to work with others, and insubordination will lead to further discipline up to and including discharge.

*Ibid.* The September 2014 reprimand letter also indicates that a copy was placed into the plaintiff's personnel file.

Thieken's letter directed the plaintiff to return to work on September 8, 2014, and to contact her supervisor ahead of time to find out where she should report. It appears undisputed that the plaintiff remains at work as a custodian for the District to this day.

On November 25, 2014, the plaintiff filed her complaint alleging violations of her First Amendment rights via 42 U.S.C. § 1983. On June 30, 2015, with leave granted, she filed an amended complaint that sets forth claims of First Amendment violations on theories of retaliation (count I) and prior restraint (count II). Discovery closed on July 31, 2015, and the parties timely filed their cross-motions for summary judgment. The Court heard oral argument on November 24, 2015.

II.

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view

all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"). The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion — by showing that no genuine dispute exists as to any material fact — and the ultimate burden of persuasion on

-8-

the claim — by showing that it would be entitled to a directed verdict at trial." William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

### A.  First Amendment Retaliation

The defendants argue that the plaintiff has failed to sustain any viable First Amendment claim because (1) under the rule of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), she is not entitled to First Amendment protection where she was merely "discussing school cleaning issues," which are matters within the scope of her job duties as a custodian; (2) the plaintiff cannot show that she suffered any adverse action because, notwithstanding the issuance of two letters of reprimand, she never actually was terminated or subjected to any other material change in her conditions of employment; and (3) even if the reprimands qualify as "adverse actions," under the balancing test described in *Pickering v. Board of Education*, 391 U.S. 563 (1968), the school district's interest in squelching "false and dangerous rumors" about asbestos hazards at its schools — which the district evidently maintains do not exist — outweighs the plaintiff's interest in engaging in speech that was merely intended to "stir up controversy." For the same reasons, the district argues that there also was no unlawful prior restraint of the plaintiff's speech.

"To succeed on a First Amendment retaliation claim, the following elements must be proven: '(1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 645 (6th Cir. 2015) (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010)). "It is well established that a

government employer cannot 'condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). "As a logical consequence, retaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation." *Ibid.* (citing *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994)). "This is the case even if the employee could have been terminated for any reason." *Ibid.* (citing *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)).

### 1. Protected Conduct

Protected conduct — the first element of the claim — is in turn determined by another three-element test. "Under the test, commonly called the *Pickering* test, the plaintiff must [establish that]: (1) the speech involved a matter of public concern, (2) the interest of the employee 'as a citizen, in commenting upon matters of public concern,' outweighs the employer's interest 'in promoting the efficiency of the public services it performs through its employees,' and (3) the speech was a substantial or motivating factor in the denial of the benefit that was sought." *Perry*, 209 F.3d at 604 (quoting *Pickering*, 391 U.S. at 568).

The jury readily could conclude that the plaintiff was speaking as a citizen on a matter of public concern. She testified that she told co-workers, her family, and other members of the community that workers and students were exposed to asbestos-laden dust when she was compelled improperly to sand floor tiles at one of the defendants' schools. The jury reasonably could conclude on the record before the Court that workers were not given any protective equipment and no effort was made to contain the resulting toxic dust, or to prevent students from being exposed to it — in fact the plaintiff testified that she saw students "writing messages" in the dust as she worked. The

-10-

plaintiff's statements to the public and the media plainly could be found to be communications that publicized a dangerous health risk at the defendants' schools that would be of grave concern to students, their parents, and other employees of the school district. *Galli v. Morelli*, 277 F. Supp. 2d 844, 854 (S.D. Ohio 2003) ("[I]t is clear that Galli's speech regarding the wall envelope, the fireproofing, and the asbestos issue touch on matters of public concern in that they all involve matters of public safety. Members of the community at large may enter Stillman Hall, and could at any time be affected if the building was improperly constructed, or if asbestos was improperly disposed of, as indicated in Galli's speech.").

The defendants contend that the plaintiff was not engaged in protected speech, but merely sought to spread "false and dangerous rumors" for the purpose of "stirring up controversy." But even assuming that some aspects of the plaintiff's statements were false or exaggerated, it is the topic of the speech and not its veracity that determines whether it is entitled to First Amendment protection. "Although First Amendment protection might not be available if the employer can show that the public employee knowingly or recklessly made false statements, a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment." *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004). The defendants have introduced some evidence that the risk may have been less than at the time of the events that gave rise to the plaintiff's concerns — at least by mid-2013. But investigators of MIOSHA found circumstances that they determined to be worthy of imposing citations, a significant fine, and remedial operational restrictions on the defendants' custodial departments at its schools that were found to have floor tiles with significant asbestos content. That evidence certainly could support a jury's conclusion that the plaintiff had genuine — and factually substantiated — serious concerns. It also would suffice for

-11-

a jury to conclude that the plaintiff acted prudently and commendably, and not at all recklessly, in voicing her concerns to the community.

The defendants also argue that the plaintiff was not engaged in First Amendment protected activity because the plaintiff was speaking solely as an employee and "pursuant to her official duties" when she voiced her concerns. *See Garcetti*, 547 U.S. at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). But that argument ignores the Supreme Court's subsequent narrowing of the holding in *Garcetti*, refocusing the question on "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, --- U.S. ---, ---, 134 S. Ct. 2369, 2379 (2014). The Court explained that "the mere fact that a citizen's speech concerns information acquired by virtue of [her] public employment does not transform that speech into employee — rather than citizen — speech." *Ibid.* It is true that the plaintiff became aware of the risks that she complained about in the course of her work. But those risks arose as a result of improper floor sanding that generated hazardous asbestos-laden dust, which posed a danger to workers, members of the public, and school children. The concerns that the plaintiff voiced related to a serious public health risk, and the plaintiff's speech was not, as the defendants would have it, limited merely to "a janitor discussing her cleaning duties."

In the jury were to conclude as much, the Court could find that the public interest in ensuring that the plaintiff was able to voice her concerns outweighed any interest that the school district had in suppressing her speech. "When an institution oversees some aspect of public safety, the correct operation of that institution is a matter of public concern," and "the interest in public safety

-12-

outweighs the state's interest in conducting its affairs collegially." *Hoover v. Radabaugh*, 307 F.3d 460, 466 (6th Cir. 2002) (citations omitted); *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 578 (6th Cir. 1997) ("Chappel directly addressed matters that are rightly near the zenith of public concern — matters of public safety." (quotations and alterations omitted)).  It is for the Court, not the jury, to strike the balance articulated by the *Pickering* court.  *Farhat*, 370 F.3d at 593; *Meyers v. City of Cincinnati*, 934 F.2d 726, 729, (6th Cir. 1991) ("The ultimate question of whether speech is protected is a matter of law.").  "The jury may, however, resolve some underlying factual questions, which can inform the legal determination of the *Pickering* balancing."  *Pucci v. Nineteenth Dist. Court*, 596 F. App'x 460, 470 (6th Cir. 2015) (citing *Donlin v. Watkins*, 814 F.2d 273, 277 (6th Cir. 1987)).  The ultimate resolution of that question must abide a trial.

The defendants also contend that the plaintiff publicized her concerns merely to foreclose the possibility that she might be laid off from her job as a result of financial circumstances in the district.  "The employee's motive for engaging in the speech in question is a relevant, but not dispositive, factor when considering whether an employee's expression is of public concern." *Farhat*, 370 F.3d at 590-91.  The record contains sufficient evidence to support a conclusion that, even if the plaintiff was in part motivated by personal interest, the balance of the *Pickering* factors still weighs in favor of allowing rather than suppressing her speech about asbestos hazards in the defendants' schools.

## 2.  Adverse Action

Typically, adverse action consists of termination from employment, but that did not happen here.  Instead, the plaintiff premises her retaliation claim on the issuance of two letters of reprimand that were sent to her, and placed in her personnel file, which warned the plaintiff to stop spreading

-13-

"false rumors" about the presence of asbestos in the defendants' school buildings. "In order to determine whether actions of lesser severity merit being deemed 'adverse' for purposes of a retaliation claim, [the Sixth Circuit has adopted] the standard suggested by Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), that an adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). "'[S]ince there is no justification for harassing people for exercising their constitutional rights [the effect on freedom of speech] need not be great in order to be actionable.'" *Id.* at 397 (quoting *Bart*, 677 F.2d at 625). The plaintiff "need not show [that she was] actually deterred from exercising [her] right to free speech." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007). "[A] credible threat to the nature and existence of one's ongoing employment is of a similar character to the other recognized forms of adverse action — termination, refusal to hire, etc." *Fritz v. Charter Twp.*, 592 F.3d 718, 724, 728 (6th Cir. 2010). "A chilling effect sufficient under this prong is not born of *de minimis* threats or inconsequential actions, but neither does the requisite showing permit solely egregious retaliatory acts to proceed past summary judgment." *Ctr. for Bio-Ethical Reform*, 477 F.3d at 822.

A jury reasonably could conclude that the plaintiff was subjected to an adverse action in the form of the second letter of reprimand warning her that she could be fired if she continued to engage in the protected speech discussed above. That letter plainly stated that continuing to engage in the "inappropriate" conduct described in the letter of reprimand could lead to further discipline including discharge. That certainly suffices to support a jury's finding that the second reprimand letter was a "'credible threat to the nature and existence of [the plaintiff's] ongoing employment,'" and such a threat is sufficient to prove an adverse action for the purposes of a First Amendment

retaliation claim. *Stolle v. Kent State Univ.*, 610 F. App'x 476, 483 (6th Cir. 2015) (quoting *Fritz v. Charter Twp.*, 592 F.3d 718, 724, 728 (6th Cir. 2010)).

### 3. Causation

"Causation is best addressed as a two part inquiry. First, we determine whether 'the adverse action was proximately caused by an individual defendant's acts,' and second, we consider whether 'the individual taking those acts was motivated . . . by a desire to punish [the plaintiff] for the exercise of a constitutional right.'" *Paterek*, 801 F.3d at 646 (quoting *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012)). "The true object of this inquiry is to determine whether the plaintiff has been retaliated against as a direct result of his or her protected speech." *Ibid.*

If the other elements of the retaliation claim are satisfied, then a jury also could find that causation is established, because it is undisputed that both of the reprimand letters issued to the plaintiff explicitly ordered the plaintiff to cease the speech at issue, and the second letter stated that the plaintiff could be fired if she did not. Where both reprimands plainly stated that they were issued *because of* the plaintiff's speech, there certainly is adequate evidence to support a finding that the protected speech was the cause of the adverse action.

\* \* \* \* \* \* \* \* \* \* \* \*

The plaintiff has offered sufficient evidence on her First Amendment retaliation claim to withstand summary judgment.

### B. Prior Restraint Claim

Where a public employee plaintiff "raise[s] a First Amendment prior-restraint claim, [the Court must] apply the two-part *Pickering* analysis to determine whether [the employer's] order was an unconstitutional prior restraint of a public employee's speech." *Whitney v. City of Milan*, 677

-15-

F.3d 292, 296 (6th Cir. 2012) (citing *Pickering*, 391 U.S. at 568; *Farhat v. Jopke*, 370 F.3d 580, 598 (6th Cir. 2004)). "First, [the Court must] determine whether the affected speech involved a public employee's comments as a private citizen on a matter of public concern. Second, if the speech involves a matter of public concern, then [the Court] must balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Ibid.* (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)). "Speech touches upon a matter of public concern 'when it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Whitney*, 677 F.3d at 297 (quoting *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)).

"Although a government employer may take steps to ensure workplace harmony and need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action, a stronger showing from the employer may be necessary if the employee's speech substantially involved matters of public concern." *Id.* at 298 (quotations and alterations omitted); *Leary v. Daeschner*, 228 F.3d 729, 737-38 (6th Cir. 2000) ("[I]f an employee's speech substantially involved matters of public concern, an employer may be required to make a particularly strong showing that the employee's speech interfered with workplace functioning before taking action.").

The prior restraint analysis is identical to the first two factors discussed above in relation to the retaliation claim; essentially the prior restraint test is the *Pickering* analysis minus the causation element. There is therefore sufficient evidence to support a finding in favor of the plaintiff on the

prior restraint claim, which is the same evidence that supports the retaliation claim. For reasons discussed above, the plaintiff has established her prior restraint claim with evidence that is sufficient to overcome the defendants' summary judgment motion.

### C. School District's Liability

The school district argues that it should be dismissed as a party because the plaintiff has failed to submit any evidence that any policy, custom, or practice of the district was the moving force behind the alleged violations, as she must in order to sustain a claim against a municipal entity under 42 U.S.C. § 1983. The Court agrees.

"To state a claim under § 1983, a plaintiff must set forth facts that, when favorably construed, establish: (1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law." *Ibid.* (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The plaintiff must establish the liability of each individual defendant by that person's own conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

It is well settled that "*respondeat superior* is not available as a theory of recovery under section 1983." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010). "Section 1983 liability must be premised on more than mere *respondeat superior*, the right to control one's employees." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009) (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

"A municipality is liable for a constitutional violation when execution of the municipality's policy or custom inflicts the alleged injury." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (citing *Monell*, 436 U.S. at 694 (1978)). Moreover, "[t]he official policy or custom 'must be

-17-

the moving force of the constitutional violation' to establish the liability of a government body."

*Ibid.* (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)). "A plaintiff can make a showing

of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal

official policy or legislative enactment; (2) that an official with final decision making authority

ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the

existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*,

735 F.3d 462, 478 (6th Cir. 2013). The absence of a written policy endorsing the constitutional

violation is not fatal to a claim. "Section 1983 'authorizes suit "for constitutional deprivations

visited pursuant to governmental 'custom' even though such a custom has not received formal

approval through the body's official decisionmaking channels."'" *Cash v. Hamilton Cnty. Dep't of*

*Adult Probation*, 388 F.3d 539, 542-43 (6th Cir. 2004) (quoting *City of St. Louis v. Praprotnik*, 485

U.S. 112, 121 (1988)). To sustain municipal liability under that theory, a plaintiff must "prove the

existence of a widespread practice that, although not authorized by written law or express municipal

policy, is so permanent and well settled as to constitute a custom or usage with the force of law."

*Id.* at 543 (citation and quotation marks omitted).

Although the plaintiff has submitted sufficient evidence to proceed on her claims against the

individual defendants, she has failed to put forth any evidence to suggest that any policy, custom,

or practice of the school district — formal or otherwise — was the moving force behind the alleged

violations of her rights. Based solely upon her strained reading of the District's disciplinary

policies, the plaintiff contends that the superintendents that issued the reprimands to her were the

"ultimate authorities" in applying discipline short of suspension or loss of pay, because the policy

only explicitly requires those more severe sanctions to be presented to the school board for review.

But nothing in the language of the District's policy *prohibits* review of less serious disciplinary sanctions, and the presence of language requiring review of more serious actions does not compel the inference that less serious ones could not also be reviewed. Moreover, the plaintiff has not put forth any evidence that even suggests that the school district had a "policy, custom, or practice" of sanctioning employees for reporting serious safety hazards at its schools, and allegations that two school administrators applied a general disciplinary policy to that particular end in this case certainly does not suffice to satisfy the plaintiff's burden under *Monell*.

### D.  Qualified Immunity

Defendants Jeffrey Bartold and Todd Thieken argue that they are entitled to qualified immunity because, at the time of the conduct in question, there was no clearly established law holding that "a governmental supervisor could not manage or direct a subordinate employee's speech related to workplace matters; a custodian speaking about cleaning issues was actually a 'citizen' speaking about matters of public concern; a written reprimand could be considered an 'adverse employment action'; or a school district's interest in quelling false and dangerous rumors does not outweigh a public employee's desire to create discord." These defendants, however, misapprehend the qualified immunity defense as it has been described by the appellate courts.

"The doctrine of qualified immunity shields government officials performing discretionary functions from civil liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Baynes v. Cleland*, 799 F.3d 600, 609 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008)). "To determine whether a government official is entitled to qualified immunity, [the court must] make two inquiries:

-19-

'First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation? These prongs need not be considered sequentially.'" *Id.* at 609-10 (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010)). "The plaintiff bears the burden to show that the defendant is not entitled to qualified immunity." *Id.* at 610 (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)). "The issue of qualified immunity may be submitted to a jury only if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury.'" *Ibid.* (quoting *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007)).

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes*, 799 F.3d at 610 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant inquiry is 'whether it would be clear to a reasonable [government official] that his conduct was unlawful in the situation he confronted.'" *Ibid.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "Although the focus of the clearly established prong is whether the official had notice that his alleged conduct was improper, . . . qualified immunity is an objective rather than a subjective inquiry." *Id.* at 610-11 (citing *Caudill v. Hollan*, 431 F.3d 900, 911-12 (6th Cir. 2005); *Cope v. Heltsley*, 128 F.3d 452, 458 (6th Cir. 1997)). "In [*Hope v. Pelzer*, 536 U.S. 730 (2002)], the Supreme Court established that, for purposes of qualified immunity, the precise factual scenario need not have been found unconstitutional for it to be sufficiently clear to a reasonable official that his actions violate a constitutional right — that is, for the right to be 'clearly established.'" *Id.* at 611 (quoting *Hope*, 536 U.S. at 739, 741). "[G]overnment officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Ibid.*

-20-

The record before the Court establishes without question that the individual defendants twice reprimanded the plaintiff and threatened to fire her, in direct response to her public speech warning co-workers and the community about a serious health hazard at the defendants' schools. Viewing that record in the light most favorable to the plaintiff, *see Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009), would allow a jury to find all of the following facts. *First*, that the state's own occupational safety and health authority found the concerns that the plaintiff voiced sufficiently serious to sanction the school district with citations for three "serious" violations, specific remedial directives, and more than $13,000 in fines. *Second*, that no more than a week after MIOSHA concluded its investigation based on the plaintiff's complaint and issued its sanctions, the defendants brazenly commanded the plaintiff to stop spreading "false rumors" about the risks from asbestos contamination that the agency report had substantiated. *Third*, that the defendants, not satisfied with merely "directing" the plaintiff to stop her protected speech, again reprimanded the plaintiff more than a year later for voicing the same concerns, this time threatening to discharge her if she did not keep quiet. Based on those findings, a jury readily could conclude that a reasonable official in the defendants' shoes would have known that what they did in May 2013 and September 2014 constituted blatant violations of the plaintiff's First Amendment-protected right to voice her concerns, by suppressing her efforts to warn the public and co-workers about a legitimate danger in a public school. And the case law cited above established well before May 2013 that the plaintiff had such a right, which any public official should have recognized.

In the qualified immunity context, as to whether a government employer's prior restraint violated a clearly established right, "'the greater the speech's relationship to a matter of public concern and the more minimal the effect on office efficiency, the more likely a reasonable person

-21-

would be to understand that the employer's actions violated the Constitution.'" *Whitney*, 677 F.3d at 299 (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006)) (alterations omitted).  Here, the hazards that the plaintiff publicized included her own observations of school children and workers being directly exposed to large amounts of asbestos-laden dust from improper and unsafe floor sanding operations that the plaintiff was ordered to perform.  That certainly qualifies as a public safety concern of the highest order.  And the defendants have not offered any evidence even to suggest that the plaintiff's communications materially disrupted the efficient operation of the schools or the communal harmony of the custodial staff.  The defendants also have not pointed to anything beyond a single "testing report" of questionable origin and veracity to substantiate their claims that the plaintiff was spreading "false and dangerous rumors" about asbestos risks at their schools.  The tenuous nature of the defendants' proffered interests in suppressing her speech, contrasted with the serious nature of the concerns she voiced, adequately establishes that the defendants are not entitled to qualified immunity at the summary judgment stage.

### E.  Plaintiff's Motion for Summary Judgment

As mentioned above, to prevail on an affirmative motion for summary judgment, the plaintiff must demonstrate that there are no material fact questions on *all* the elements of her claims.  *Vance*, 648 F. Supp. 2d at 919.  She has not made a sufficient showing to prevail on that position.  Although the plaintiff's evidence certainly is sufficient to sustain all of the elements of her claims, a jury remains free to accept or reject that evidence, either in whole or in part.  And the record is not so decidedly one-sided on every element of the plaintiff's claims as to compel the conclusion that no jury reasonably could avoid finding in her favor.  In particular, a jury reasonably could conclude that there was no retaliation because the defendants never took any adverse action against the plaintiff.

Although the second letter of reprimand plainly can be read as a "credible threat to the nature and existence of [the plaintiff's] ongoing employment," it also could be reasonably and narrowly read to threaten termination premised solely on the numerous other incidents of misconduct cited, and not on the repetition of the protected speech about asbestos hazards.  It is true that the letter reiterates the directive for the plaintiff to stop her speech, but the final and most sharply worded section warns the plaintiff that "such conduct, absenteeism, continued unwillingness to work with others, and insubordination will lead to further discipline up to and including discharge."  That boilerplate warning reasonably could be read as indicating only that discharge was a possible sanction, not an imminent or probable one.  And it also could be construed as referring only to incidents of "conduct" such as insubordination and absenteeism.

The passage does not state explicitly that the plaintiff would or could be terminated for continuing to spread "false rumors," and in fact the letter does explicitly state that it was not intended to "prohibit you from bringing to the attention [of school district officials] any unsafe issues in the district."  The contemplated "conduct" that the letter refers to as possibly leading to termination could be interpreted to include the plaintiff's communications to co-workers and others about asbestos hazards, but it also could be construed as embracing only her non-communicative acts such as failing to show up for work.  The fact that a plaintiff has engaged in protected speech certainly does not foreclose a public employer from properly disciplining or even terminating an employee for plain violations of work rules and policies, and the jury reasonably could conclude that the gist of the second reprimand letter in this case was simply a legitimate warning that the plaintiff's poor work habits could lead to the end of her job.  *Rutan v. Republican Party of Illinois*,

497 U.S. 62, 76 (1990) ("The First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge.").

As to the first letter, the jury readily could conclude that it invoked no adverse action at all, because it never states — or even suggests — that any further action would be taken against the plaintiff if she defied the directive to stop talking about asbestos hazards with co-workers and members of the public. That letter states that the district regarded the plaintiff's speech as violating several policies, and it directed her to stop the speech, but it could be regarded as nothing more than a strongly worded request for the plaintiff to stop her speech, that did not threaten any tangible consequences for her employment if she chose to disregard it. The jury therefore readily could conclude that nothing in the first letter comprises any sort of "credible threat" to the plaintiff's continued employment with the district, and the issuance of the letter did not amount to adverse action.

As to the prior restraint claim, the jury reasonably could conclude that, in as much as both of the letters of reprimand only directed the plaintiff to cease spreading "false rumors," they did not actually command the plaintiff to stop any legitimately protected speech in which she had engaged or continued to engage.

The district presumably contends that, although there are some asbestos containing materials in certain parts of the district's school buildings, under normal circumstances those materials do not pose any cognizable hazard to students and employees, and that any circumstances that might cause those materials to become hazardous (e.g., the "sanding" of floor tiles) no longer was occurring — if it ever did occur — when the plaintiff started talking to co-workers and the media about asbestos. The district contends that the letters of reprimand were intended merely to direct the plaintiff to stop

-24-

making exaggerated and unsubstantiated statements that any present asbestos hazard existed in or after May 2013 in the district's schools that might represent an imminent threat to the health of students or workers.  And a jury might find that construction of the letters to be credible.

In fact, the MIOSHA investigation report noted that the alleged "sanding" of floor tiles had been conducted months before the agency's site visit, and, although citations with corrective measures were issued, those reasonably could be construed as prophylactic only, designed to avoid any possible future risk to students and employees at the schools, and to monitor for consequences of any past risk that no longer was salient at the time of the report.  There is no indication in the report that any actual imminent risk to students or workers was observed at the time of the agency's site visits.  If the jury concludes that the district's only action was to warn the plaintiff to stop making false statements that risks presently existed at the time of her speech, then it could find that the defendants' conduct was directed properly to squelching exaggerated accounts of an overstated hazard.

Because fact questions remain, the plaintiff has not shown that she is entitled to a judgment in her favor as a matter of law.

## III.

The plaintiff has not offered evidence that establishes a claim against the municipal defendant.  However, she has offered sufficient evidence to create jury-submissible claims against the individual defendants.  And she has shown that those defendants violated her constitutional rights that were clearly established at the time.  The existence of fact questions preclude summary judgment as a matter of law for the plaintiff and the individual defendants alike.

-25-

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #19]

is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**

as to defendant Dearborn Heights School District Number 7, **ONLY**.

It is further **ORDERED** that the plaintiff's motion for summary judgment [dkt. #20] is

**DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   December 14, 2015

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on December 14, 2015.

s/Susan Pinkowwki
SUSAN PINKOWKSI